UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 13 |
| | : | |
| **Kyle Westley Bridgeforth,** | : | Case No.  5:14-04499-MJC |
| | : | |
| Debtor. | : | |

| | | |
|---|---|---|
| **Kyle W. Bridgeforth,** | : | |
| | : | |
| Plaintiff, | : | Adversary Proceeding |
| | : | No.  5:15-00011-MJC |
| v. | : | |
| | : | |
| **US Department of Education,** | : | |
| | : | |
| Defendant. | : | |

**O P I N I O N**

## I.  INTRODUCTION

Debtor Kyle Bridgeforth ("Debtor") commenced this adversary proceeding seeking a discharge of $177,595.52 of his student loan obligations under 11 U.S.C. §523(a)(8). It is well established under Third Circuit precedent that a debtor seeking to discharge student loan debt must demonstrate that:

> (1) based on current income and expenses, the debtor cannot maintain a "minimal" standard of living for himself or herself and his or her dependents if forced to repay the loans;
>
> (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for the student loans; and
>
> (3) the debtor has made a good faith effort to repay the loans.

<u>Pennsylvania Higher Education Assistance Agency v. Faish</u>, 72 F.3d 298, 305-06 (3d Cir. 1995) (quoting <u>Brunner v. New York Higher Educ. Servs. Corp.</u>, 831 F.2d 395, 396 (2d Cir. 1987)).

1

This standard is known as "the Brunner test." All three prongs of the test must be established by a preponderance of the evidence for a discharge to be obtained. Faish, 72 F.3d at 306.

Defendant United States Department of Education ("USDE") opposes Debtor's request for discharge of his student loans. USDE contends that: (1) Debtor did not satisfy the first prong of the Brunner test because based on current income and expenses, Debtor failed to show that he cannot maintain a "minimal" standard of living for himself and his dependents if forced to repay the loans; (2) Debtor did not satisfy the second prong of the Brunner test because he did not prove that his current financial difficulties are likely to persist for an extended period of time; and (3) Debtor cannot satisfy the third prong's good faith requirement because he failed to exhaust all available repayment plans that could reduce his monthly payment.

To prevail under §523(a)(8) requires the imposition of a "heightened standard" for the discharge of student loans, one that imposes a "heavy burden" on the debtor. See e.g., In re Traversa, 2010 WL 1541443, at *10 n. 19 (Bankr. D. Conn. Apr. 15, 2010) (citations omitted); see also In re DiFrancesco, 607 B.R. 463, 467 (Bankr. M.D. Pa. 2019); In re Armstrong, 394 B.R. 43, 51 (Bankr. M.D. Pa. 2008). After applying the "heightened standard" to the facts presented here, the Court concludes that Debtor has not met his "heavy burden" of establishing undue hardship under §523(a)(8) and, accordingly, is not allowed a discharge of his student loan debt in this bankruptcy case.

## II. PROCEDURAL HISTORY[1]

On September 29, 2014, Debtor filed his Voluntary Petition for Relief under Chapter 13 of the Bankruptcy Code ("Petition"). Debtor filed his Petition pro se and has not had the benefit

---

[1] Docket entries in the main bankruptcy case are noted as "BK Dkt." and all other docket entries refer to this Adversary Proceeding.

of legal representation throughout this case. From the docket in the main case, it is apparent that because of Debtor's lack of legal counsel, the plan approval process was tortuous.[2] Debtor filed his initial Chapter 13 plan on October 24, 2014, BK Dkt. # 15, and after many objections and amendments, the Court confirmed Debtor's Ninth Amended Chapter 13 Plan ("Confirmed Plan") by the Order dated October 19, 2017, BK Dkt. # 160.

The Confirmed Plan provided for total payments of $20,649.00, with "stepped-up" payments of $954.11 per month from October 2018 through September 2019. After the Chapter 13 Trustee reported that plan payments had been completed, Debtor received his discharge on November 21, 2019. BK Dkt. # 171.

On January 22, 2015, Debtor commenced this adversary proceeding against USDE by filing a "bare-bones" two (2) page complaint ("Complaint") seeking a determination that his student loans are dischargeable pursuant to 11 U.S.C. §523(a)(8). The USDE filed its answer on June 5, 2015, Dkt. # 13.

Judge John Thomas conducted trial on January 12, 2016. Debtor completed his case in chief and the USDE had presented a loan analyst to testify. Judge Thomas indicated that he would reserve ruling on dischargeability because confirmation of the plan and an ultimate discharge was in doubt. Unfortunately, Judge Thomas died in 2019, a Pandemic hit in 2020, Judge Robert Opel retired in early 2021 and, as a result, this proceeding languished.

This Court held a status conference on October 28, 2021, and after a colloquy with Debtor and counsel for the USDE, concluded that this matter was ripe for a decision.

---

[2] Judge Thomas in a prior Opinion in this case stated: "[t]he Debtor's journey through the Chapter 13 labyrinth has been painfully slow due to his commitment to securing confirmation without legal assistance. I conclude that the failure to confirm over the course of almost 3 years despite having filed 9 proposed plans, has simply caused an unreasonable delay in this case - certainly exasperating the patience of creditors." In re Bridgeforth, 571 B.R. 669, 671 (Bankr. M.D. Pa. 2017). Notwithstanding this finding, Judge Thomas gave Debtor one more chance to propose a confirmable plan.

3

## III. JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334. The claim asserted in the Complaint is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I). Venue is proper pursuant to 28 U.S.C. §1408.

## IV. FINDINGS OF FACT

At trial, Debtor testified and provided only minimal facts to support his position.[3] Additional relevant facts were elucidated after questioning by the Court and cross-examination by the USDE. From Debtor's Schedules filed in his bankruptcy case and from the trial transcript, the following facts are relevant to this matter:

1. At the time of trial, Debtor was 42 years old. He is married with two (2) children, ages 17 and 11. January 12, 2016 Trial Transcript ("TR") at 41, 49-51.

2. Debtor and his family reside in East Stroudsburg, Pennsylvania. Debtor paid $313,000.00 for his home and estimates the value of the residence to be around $220,000.00 to $230,000.00 at the time of trial.[4] TR at 53.

---

[3] Debtor testified by narrative in a limited manner relating very minimal details on his financial and medical condition, in an attempt to meet his burden under <u>Brunner</u>. His "direct" testimony ended at page 17 of the trial transcript.

[4] Debtor listed the value of the home as $239,000.00 on his Schedule A.

3. There are two (2) mortgages against the home. TR at 33. The monthly payment on the primary mortgage to JPMorgan Chase Bank is approximately $1,845.00. TR at 64; Am. Sch. J, BK Dkt. # 125.[5]

4. Debtor has been employed full-time with the Federal Government since 1999. TR at 20. His current position is an Enforcement Officer with the U.S. Customs and Border Protection. Id.

5. Debtor is subject to mandatory retirement from his current employment at age fifty-seven (57). Id. at 15, 42-43.

6. Debtor will receive a pension after the mandatory retirement.[6] Id. at 44-45.

7. Debtor suffers from certain health conditions including hypertension, high cholesterol, hyperthyroidism, and is in the early stages of kidney failure.[7] TR at 46-48; Ex. US-3.

8. Despite his numerous health conditions, Debtor has continued to work full-time.[8] TR at 35, 38-39.

---

[5] Debtor was able to avoid the second mortgage through his Confirmed Plan as the Objection filed by Wilmington Savings Fund Society was overruled. BK Dkt. # 159. Debtor testified that the second mortgage payment was almost $1,000.00 per month. TR at 64.

[6] Debtor did not quantify the amount of his pension with much precision. At one point, he testified that his anticipated income after retirement will be nearly 40% less of this salary, TR at 15, but later, he stated that his retirement *including social security benefits* will be slightly less than half his currently salary. Id. at 44-45. The Court notes that assuming that Debtor retires at the mandated age 57, it will be several years before he will be eligible for social security benefits, i.e., at age 62. Moreover, Debtor did not address whether this estimation took into account early retirement withdrawals. See ftnt. 9, infra.

[7] Debtor was unsure of what stage of kidney disease he was in but testified that he had swelling in his feet.

[8] On October 28, 2021, Debtor indicated he is still working full-time.

5

9. Debtor's gross annual income has had some minor fluctuations. For the period 2008 to 2014, Debtor's income ranged from $94,500.00 to $113,400.00.[9] Exhibit US-3; TR at 28-29. At the time of trial, Debtor's spouse earned $65,000.00 annually. TR at 29-30.

10. As of February 3, 2017, Debtor's gross income is $117,269.40 and his spouse's income is $75,592.56, for a combined gross annual household income of $192,861.96. Am. Stmt. Current Monthly Income, BK Dkt. # 140.

11. As of January 11, 2017, net household income is approximately $9,245.00 per month, which equates to approximately $110,928.00 annually. Am. Sch. I, BK Dkt. # 124.

12. Debtor's household expenses, as reported in January 2017 on his amended Schedule J, are $10,246.59. See BK Dkt. # 125. Household expenses eclipse net household income by approximately $1,000.00. See id.

13. Utilities, including electricity, heat, water, garbage collection are $1,092.37 per month. Id. Telephone, cell phone, internet, and cable are $528.99 per month. Id.

14. Debtor expends $1,000.00 per month on food and housekeeping supplies.[10] Id. Clothing, laundry, and dry clean are $500.00 per month. Id.

15. Other notable monthly expenses include: $1,262.00 for transportation,[11] $400.00 for entertainment and recreation, and $1,425.53 for Debtor's spouse's student loan, credit cards, and his son's expenses. Id.

---

[9] These figures included salary plus varying amounts of early retirement withdrawals, aggregating approximately $35,000.00.

[10] Debtor testified that the family goes out to dinner "maybe once a week." TR at p. 59.

[11] Both Debtor and his spouse commute to New York City for work. TR at 53-54.

6

Case 5:15-ap-00011-MJC    Doc 77    Filed 01/26/22    Entered 01/27/22 08:04:33    Desc
Main Document    Page 6 of 16

16. Debtor's oldest child was planning on attending college later in 2016.[12] TR at 62.

17. In 2014, prior to filing his bankruptcy, Debtor's family of four (4) went on a vacation to Europe for 14 days for a wedding at a cost of $5,976.42.[13] TR at 37-38.

18. In 2010, Debtor's family went on a vacation to the Bahamas for 4 to 7 days, also paid for by Debtor's spouse. TR at 38.

19. Debtor holds education degrees from New York Technical College and Buffalo State College, a Masters of Business Administration from University of Phoenix, and attended Walden University, where he completed credits towards a Doctorate of Criminal Justice. TR at pp. 20-25.

20. Debtor incurred several loans from 1994 through 2008 to finance his education. TR at p. 35; Ex. US-2. The various loans were consolidated into one loan in 2013 ("the Loan"). Ex. US-4; TR at 30-31, 75.

21. As of January 8, 2016, Debtor owed $177,595.52 on his Loan. Ex. US-1; TR at 9. The loan has a 30-year repayment period, and based on the repayment option that Debtor chose, the payment is $1,237.00 per month. TR at p. 11-12, 75-76.

22. Prior to consolidating in 2013, Debtor paid $3,979.36 towards the Loan.[14] TR at 55; Ex. US-3. After consolidating, Debtor did not make any payments on the Loan. Id. at 36.

---

[12] Debtor indicated that he had no funds set aside for his children's education; however, he was hopeful his son would receive a wrestling scholarship or consider the military. Id.

[13] Debtor testified that his spouse paid for the vacation by taking a loan against her retirement account. Id.

[14] At a status conference in October 2021, Debtor informed the Court that the testimony he presented regarding the total amount paid on the Loan was incorrect. He estimated that in addition to the $3,979.36, he paid approximately $20,000.00 to "ACS" (presumably another servicer of the Loan) and

23. Debtor's student loan has been in "administrative forbearance" since the filing of the bankruptcy. TR at p. 79; see also Ex. D-1.

24. Debtor applied for an income-based repayment program ("IBR"), and according to Debtor, the payment would have been approximately $1,500.00 per month. TR at 34.

25. The USDE has other repayment options to assist borrowers and lessen the associated interest costs such as graduated repayment and income-driven repayment plans.[15] There are also alternative forms of relief such as total and permanent disability in case health conditions deteriorate, as well as public service, loan forgiveness programs for those that work in Federal agencies. TR at 75.

26. The USDE offers other repayment programs that would have resulted in lower payments for Debtor's student loan.[16] TR at p. 76.

## V. DETERMINATION OF DISCHARGEABILITY OF STUDENT LOANS

### A. Statutory Authority—11 U.S.C. § 523(a)(8)

The statutory authority for determining the discharge of student loans in a chapter 7 case is governed by 11 U.S.C. §523(a)(8). This section provides:

---

$10,700.00 through his confirmed plan. The Chapter 13 Trustee's Final Report confirms that Navient Solutions, Inc. received $10,760.06. See BK Dkt. # 175.

[15] Cathleen Fabila testified on behalf of the USDE. She is a loan analyst with the USDE. TR at 73-74.

[16] For instance, Ms. Fablia testified that under the standard repayment plan, Debtor's payment would have been $823.14 per month. Id. at 76. She further testified that under the graduated repayment plan, Debtor's initial monthly payments would have been a couple hundred dollars lower but every two years it would increase, and end up at around $1,300.00 per month. Id.

8

> (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—
>
> (8) *unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents,* for—
>
> > (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
> >
> > (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
> >
> > (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual....

11 U.S.C. §523(a)(8) (emphasis added). A debtor seeking to discharge a student loan pursuant to §523(a)(8) bears the burden of establishing that the debtor and his or her dependents will experience an "undue hardship" if the student loan is excepted from the debtor's discharge. See Faish, 72 F.3d at 306; In re Zierden–Landmesser, 249 B.R. 65, 70 (Bankr. M.D. Pa. 2000).

In this adversary proceeding, neither party raised an issue of whether Debtor's Loan meets the requirements of §523(a)(8)(A)(i), in that, it is "an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit …." Therefore, the Loan is presumed to be non-dischargeable unless Debtor can establish that repayment would "impose an undue hardship on the debtor and the debtor's dependents." §523(a)(8).

### B. The Undue Hardship Test Under Brunner and its Progeny

The Third Circuit in Faish, supra, adopted the test for "undue hardship" outlined by the Second Circuit Court of Appeals in Brunner, supra.[17] The three-part test requires: (1) the present

---

[17] Because there was a prior split among courts regarding how to determine "undue hardship," the Faish Court analyzed each of the three most prominent tests being applied by different courts at the time:

inability to repay the loan while maintaining a minimal standard of living; (2) additional circumstances suggesting that the present inability to pay will continue for a significant period of the loan's repayment period; and (3) a past, good faith effort to repay the loan. Brunner, 831 F.2d at 396. In finding that the Brunner test is the "definitive, exclusive authority that bankruptcy courts must utilize to determine whether the undue hardship exception applies," the Faish Court stated:

> Student-loan debtors have the burden of establishing each element of the Brunner test. All three elements must be satisfied individually before a discharge can be granted. If any one of the requirements of the Brunner test is not met, the bankruptcy court's inquiry must end there, with a finding of no dischargeability. … Equitable concerns or other extraneous factors not contemplated by the Brunner framework may not be imported into the court's analysis to support a finding of dischargeability. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206, 108 S. Ct. 963, 969, 99 L. Ed. 2d 169 (1988) ("whatever equitable powers remain in the bankruptcy courts can only be exercised within the confines of the Bankruptcy Code").

Faish, 72 F.3d at 306.

The Faish Court went further in support of the Brunner test finding that:

> The Brunner standard meets the practical needs of the debtor by not requiring that he or she live in abject poverty for up to seven years before a student loan may be discharged. On the other hand, the Brunner standard safeguards the financial integrity of the student loan program by not permitting debtors who have obtained the substantial benefits of an education funded by taxpayer dollars to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices.

---

the Johnson test, In re Johnson, 1979 U.S. Dist. LEXIS 11428 (E.D. Pa. June 27, 1979), the Bryant test, In re Bryant, 72 B.R. 913 (Bankr. E.D. Pa. 1987), and the Brunner test. As the Faish Court observed, the Brunner test had been adopted by a majority of the Courts of Appeals that had specifically addressed the issue of what standard should be applied in determining whether "undue hardship" exists. The Faish Court concluded: "[w]e therefore hold that the Brunner 'undue hardship' test must now be applied by bankruptcy courts within the Third Circuit." Faish, 72 F.3d at 306.

Faish, 72 F.3d at 305-06.[18]

As stated above, to prevail under §523(a)(8), Debtor has the burden of proof on each element of the Brunner test. As set forth below, Debtor did not meet this heightened standard.

### 1. The First Prong under Brunner

The first prong of the Brunner test requires a debtor to show that at the debtor's current level of income and expenses, the debtor cannot maintain a minimal standard of living if forced to repay his or her student loans. Faish, 72 F.3d at 304-05. A "minimal standard of living"

> is not a fixed measure, and the concept is not defined by bright lines. The upper limits of a minimal standard of living generally allow for a debtor to purchase "the basic necessities, such as food, clothing, housing and medical treatment." While it does not relegate a debtor to the depths of "abject poverty, a minimal standard of living does not accommodate 'luxury type expenses.'" After providing for his or her basic needs, a debtor may not use her ... financial resources for discretionary expenditures in lieu of repaying student loan creditors.

In re Miller, 409 B.R. 299, 311 (Bankr. E.D. Pa. 2009) (quoting In re Johnson, 400 B.R. 167, 173 (Bankr. M.D. Pa. 2009) (internal citations omitted)). "It is well established that maintaining a minimal standard of living does not mean that [a] [d]ebtor has to live at a poverty level to repay [a] student loan." In re Alston, 297 B.R. 410, 415 (Bankr. E.D. Pa. 2003) (citations omitted). "Given the absence of 'bright lines,' perhaps the best that can be said is that 'a minimal standard of living lies somewhere between poverty and mere difficulty.'" Miller, 409 B.R. at 311 (quoting In re McLaney, 314 B.R. 228, 234 (Bankr. M.D. Ala. 2004), aff'd as modified, 375 B.R. 666 (M.D. Ala. 2007)).

---

[18] At the time Faish was decided, §523(a)(8) required that student loan payments had to be due at least seven (7) years prior to the filing of the petition. That requirement was omitted in 1998 as part of the Higher Education Amendments of 1998, 112 Stat. 1581.

11

Case 5:15-ap-00011-MJC    Doc 77    Filed 01/26/22    Entered 01/27/22 08:04:33    Desc
Main Document    Page 11 of 16

In Miller, the Court identified that the list of basic needs set forth in In re Ivory, 269 B.R. 890 (Bankr. N.D. Ala. 2001) is helpful in assessing the contours of a minimal standard of living. See Miller, 409 B.R. at 311-12. Those elements of a "minimal standard of living" identified in Ivory are:

> (1) shelter that is furnished, clean, free of pests and climate-regulated with heating and cooling;
>
> (2) basic utilities such as electricity, water, gas and telephone;
>
> (3) food and personal hygiene products;
>
> (4) transportation or vehicles (and the ability to service and insure those vehicles);
>
> (5) life insurance and health insurance (or the ability to pay for medical and dental expenses);
>
> (6) modest recreation.

Id. at 311 (quoting Ivory, 269 B.R. at 899); see also In re Johnson, 400 B.R. 167, 173 (Bankr. M.D. Pa. 2008); In re Armstrong, 394 B.R. 43, 54 (Bankr. M.D. Pa. 2008). A minimal standard of living does not include "luxury type expenses." Armstrong v. Access Grp. (In re Armstrong), 394 B.R. 43, 54 (Bankr. M.D. Pa. 2008) (citing Educ. Credit Mgmt. Corp. v. Degroot (In re DeGroot), 339 B.R. 201, 209 (D. Or. 2006)). Furthermore, excessive amounts spent on otherwise reasonable expenses may establish that a debtor is able to maintain a minimal standard of living. Id. Thus, a court must evaluate a debtor's income and expenses to determine whether there are expenditures in excess of the minimal standard of living that can be reallocated to payment of the debtor's student loans. Miller, 409 B.R. at 312.

The IRS Local Standard for Housing and Utilities and Other Expenses[19] for a family of

---

[19] The IRS's Collection Financial Standards are used to help determine a taxpayer's ability to pay a delinquent tax liability. These standards are regularly used in the bankruptcy means test. They may be found on the United States Trustee's website at http://www.usdoj.gov/ust. Several courts have used the

four (4) living in Monroe County, Pennsylvania is $1,622.00. This standard expense figure includes mortgage or rent, property taxes, interest, insurance, maintenance, repairs, gas, electric, water, heating oil, garbage collection, telephone, cell phone, internet, and cable. In comparison, Debtor expends approximately $4,500.00 per month for these expenses.[20] The national Collection Financial Standards for Food, Clothing, and Other Items for a family of four is $1,482.00. This includes necessary expenses for food, housekeeping supplies, apparel and services, personal care products and services, and miscellaneous items. Debtor spends approximately $1,620.00 per month.[21] Furthermore, Debtor and his wife spend $1,262.00 per month on transportation, commuting to and from New York City for their employment. The national Transportation Expense Standard for the Northeast Census Region for one vehicle is $278.00 and two vehicles is $556.00.

From these comparisons, it is evident that Debtor has not sufficiently minimized his household expenses. His monthly utilities expenses of $1,092.37, which include electricity, heat, water, garbage collection, is clearly excessive. His clothing, laundry, and dry cleaning expenses of $500.00 per month are also excessive. Further, an entertainment and recreation expense of $400.00 per month is also excessive. All these categories of expenses could be reduced and reallocated to the payment of the Loan.

Furthermore, taking into account the above parameters, it is difficult to reconcile the

---

IRS Collection Standards as a guide in assessing the reasonableness of expenses in the student loan dischargeability context. See e.g., Miller, 409 B.R at 318; Ivory, 269 B.R. at 906.

[20] Mortgage payment = $1,845.21; Real estate taxes = $1,033.25; Electric, heat, natural gas = $716.11; water, sewer, garbage collection = $376.26; Telephone, cell phone, internet, cable = $528.99. Total = $4,499.82. See Am. Sch. J, BK Dkt. # 125.

[21] Food and housekeeping supplies = $1,000.00; clothing, laundry, and dry cleaning = $500.00; personal care products and services = $120.00. Total = $1,620.00. See id.

"minimal standard of living" test with Debtor's 14-day family trip to Europe sometime in the year preceding the filing of his bankruptcy case. Likewise, it is equally difficult to reconcile his household income of almost $200,000 per year with any of the cases reviewed by the Court relating to discharge of student loan matters.

For example, in In re Crawley, 460 B.R. 421 (Bankr. E.D. Pa. 2011), the Court found that it was a "close one" but that the debtor met her burden under Brunner where she was living on $1,451.00 per month, plus food stamps, for a household of five (5). Id. at 437.[22]

In Faish, the Third Circuit affirmed the District Court's finding that the debtor there did not meet her burden under the first prong of the Brunner test. The facts in Faish are not like Debtor's facts here. In Faish, the debtor was a single mother of a dependent son earning a gross salary of $27,000 per year in 1993. 72 F.3d at 300. She had several health problems and did not own a car. Id. She had obtained a Master's degree but was unable to find a high paying job in her chosen field and had accumulated $31,879.31 in student loans. Id. In applying the first prong of the Brunner test, the Court found that it must determine whether Faish "cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans." Id. at 306 (quoting Brunner, 831 F.2d at 396). Further, Brunner's first prong requires

---

[22] The Crowley Court looked to the poverty guidelines published by the U.S. Department of Health and Human Services as being helpful in its analysis. At the time of the Debtor's bankruptcy filing the poverty level for a family of four (4) was $23,850.00 per year, in 2016 at the time of trial it was $24,300.00, and as of 2021, it is $26,500.00. See 79 FR 3593-01 (Jan. 22, 2014); 81 FR 4036-01 (Jan. 25, 2016); 86 FR 7733-01 (Feb. 1, 2021); see also In re Mosley, 330 B.R. 832, 841 (Bankr. N.D. Ga. 2005), aff'd, 494 F.3d 1320 (11th Cir. 2007) (debtor whose income falls below established poverty level presumptively meets first prong); In re Rutherford, 317 B.R. 865, 878–79 (Bankr. N.D. Ala. 2004) (official poverty level is below minimal standard of living). Debtor and his family here are not even close to the poverty level.

> more than a showing of tight finances. Faish has failed to establish through evidence presented at trial that, based upon her current income and expenses, she could not maintain a minimal standard of living if forced to repay her loans. Therefore, we conclude that Faish has failed to satisfy the first element of the Brunner test. Accordingly, we need not decide whether she would have satisfied the second and third elements of our new standard. We therefore hold that Faish's entire student-loan obligation is nondischargeable.

Id. at 306.[23]

Here, the Debtor's household income is approximately $16,000.00 per month for a family of four (4) as of January 2017. See Am. Sch. I, BK Dkt. # 124. After an extensive review of the record in this case and despite Debtor's opinion that he maintains only a "minimal standard of living," see TR at 58, it is clear that the Debtor maintains substantially more than a minimal standard of living. During the course of his bankruptcy case, the Debtor was able to discharge approximately $67,973.89 of unsecured debt (see Schedule J after deducting the listed student loans, BK Dkt. # 14). He also avoided his second mortgage payment of $1,000.00 per month through the terms of the Confirmed Plan. He completed his Plan payments where the last monthly payments were $954.11 per month from October 2018 through September 2019.[24] Further, given the time since trial, his 17-year-old son would now be 23 years old and presumably no longer a dependent. From these facts, it appears clear that the Debtor would be able to maintain at least a "minimal standard of living" if forced to repay his student loans. See DeGroot, 339 B.R. at 209 (holding that courts may consider extent to which having other debts discharged will aide debtors in satisfying student loan obligation).

---

[23] The Faish bankruptcy case was filed in this Court. The Bankruptcy Court had found that the debtor was entitled to a partial discharge of her student loans based upon the Johnson test and "based upon the equities involved..." Faish, 72 F.3d at 301 (quoting the Bankruptcy Court decision). This was reversed by the District Court and that decision was affirmed by the Third Circuit. "[E]quitable concerns or other extraneous factors not contemplated by the test may not be imported into the analysis of 'undue hardship.'" In re Brightful, 267 F.3d 324, 328 (3d Cir. 2001).

[24] These payments could now be used to pay his student loans.

For these reasons, the Court finds that the Debtor has failed to meet his "heightened standard" of showing that he cannot maintain a minimal standard of living if forced to repay his student loans. As <u>Faish</u> requires that all three elements must be satisfied individually before a discharge can be granted, if any one of the <u>Brunner</u> requirements is not satisfied, the bankruptcy court's inquiry must end there, with a finding of no dischargeability. <u>Faish,</u> 72 F.3d at 306. This Court, therefore, must stop at the first prong.

## VI. CONCLUSION

For the reasons stated above, Debtor/Plaintiff has not met his burden to establish the right to discharge his student loan debt under 11 U.S.C. §523(a)(8).

An appropriate order will be entered.

Dated: January 26, 2022

By the Court,

Mark J. Conway, Bankruptcy Judge